UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

PETER VARGA,

                    Plaintiff.

          – against –

FLOWCON, INC. *and* GRAND MERCI,
LLC,

                    Defendants.

**OPINION & ORDER**

22 Civ. 7477 (ER)

---

FLOWCON, INC.,

                    Third-Party
                    Plaintiff,

          – against –

LSJ CUSTOM FINISH CARPENTRY
LLC,

                    Third-Party
                    Defendant.

---

R<span>AMOS</span>, D.J.:

        Peter Varga brings this action against Flowcon, Inc. ("Flowcon") and Grand
Merci, LLC ("Grand Merci") (collectively, "Defendants"), for injuries he suffered from
falling from a ladder while performing construction work for Defendants.  Varga brings
claims of negligence, as well as of violations of §§ 200, 240(1), and 241(6) and of the
New York Labor Law ("NYLL").

        Before the Court are Varga's motion for partial summary judgment and Flowcon's
and Grand Merci's cross-motions for summary judgment.  For the following reasons,
Varga's motion is GRANTED in part and DENIED in part, Flowcon's motion is
DENIED, and Grand Merci's motion is GRANTED in part and DENIED in part.

# I.    BACKGROUND

## A.    Factual Background[1]

### 1.    *The Parties, Premises, and Construction Project*

Peter Varga was hired by LSJ Custom Finish Carpentry LLC ("LSJ") to perform carpentry and sheetrock work at the premises located at 65 Irving Place, New York, New York ("65 Irving").  Doc. 109-1 ¶ 11.  Varga, a citizen and resident of Hungary, speaks "a little bit" of English; he testified at his deposition with the assistance of a Hungarian interpreter.  Doc. 38 (Amended Complaint ("AC")) ¶ 5; *see* Doc. 101-2 at 2, 5.

Grand Merci is a limited liability company organized in Missouri, which in 2020, purchased 65 Irving.  AC ¶ 7.  At the time it was purchased in 2020, 65 Irving was zoned for "mixed use," with specific floors designated for commercial or residential purposes.  Doc. 109-1 ¶ 5.  Specifically, "[t]he first (ground) floor and part of the second floor were zoned for commercial use; and part of the second floor, and the third, fourth and fifth floors were zoned for residential use."  *Id.* ¶ 5.  These zoning classifications remained unchanged on May 18, 2022, the date of the incident at issue in this case.[2]  *Id.* ¶ 6.

James McKelvey and Anna Ntenta a/k/a Anna McKelvey (together, the "McKelveys") own Grand Merci and were deposed in this case.  *See generally* Docs. 101-3 (Deposition Transcript of Mr. McKelvey), 101-4 (Deposition Transcript of Ms.

---

[1] The following facts are taken from the parties' Local Rule 56.1 Statements, and the parties' responses thereto, as well as their deposition transcripts.  The facts recited here are undisputed unless otherwise noted.  Documents 91, 95, and 99 are the Rule 56.1 statements submitted by Varga, Grand Merci, and Flowcon, respectively.  Flowcon does not provide a counterstatement to Varga's Rule 56.1 statement, and thus the Court deems Varga's statements of fact admitted by Flowcon.  Document 106 is Varga's counterstatement to Flowcon's Rule 56.1 statement.  Document 109-1 is Grand Merci's corrected counterstatement to Varga's Rule 56.1 statement, and it also restates Grand Merci's Rule 56.1 statements of fact.  Document 103 is Varga's counterstatement to Grand Merci's Rule 56.1 statement.  In Varga's counterstatements to Flowcon's and Grand Merci's Rule 56.1 statements, any fact Varga does not dispute will be deemed admitted by Varga.  *See* Docs. 103, 106.

[2] However, Varga states that, after the incident, "the commercial portion of the building was *expanded* by [Grand Merci] *to also include* the entirety of the second floor and a portion of the third floor."  Doc. 106 ¶ 17 (emphasis in original) (citing Doc. 107-1 (Grand Merci's November 11, 2022 NYC Zoning Board application)).

McKelvey).  Mr. McKelvey testified that it was his idea to form Grand Merci for the specific purpose of purchasing 65 Irving.  Doc. 106 ¶ 2; *see* Doc. 101-3 at 22.  He also explained that he is "a public figure and people can Google [his] net worth," and so he additionally formed the LLC because he does not want the public to know where he lives.  Doc. 101-3 at 120.  The McKelveys testified that they own nine or ten residences, in four different states, with three located in New York—including their primary residence.  Doc. 101-3 at 195; Doc. 101-4 at 20, 21.  Mr. McKelvey testified:  "We like to have some real estate exposure and real estate tends to appreciate, but when we buy a residence, it's because we plan to use it.  Not because we are primarily interested in making money."  Doc. 101-3 at 197.  Mr. McKelvey testified that, in addition to the home properties, he has "substantial real estate investments" in 30 to 50 properties, worth hundreds of millions of dollars.  *Id.* at 63.  Separately, Mr. McKelvey stated that he has an ownership or partnership interest in more than 50 companies.  *Id.* at 12.

The parties dispute what purpose 65 Irving was intended for at the time that Grand Merci purchased it.  Mr. McKelvey testified that the McKelveys intended for it to be their primary residence; they planned to move there from their other home in New York City, and to "put [their] kids to school in New York."  Doc. 101-3 at 196.  In its papers, Grand Merci refers to 65 Irving as a "townhouse," and states that neither the McKelveys nor anyone else on behalf of Grand Merci *ever* intended to utilize any portion of the premises for anything other than as their primary residence.  Doc. 95 ¶ 58.[3]  However, James Day, who served as on-site supervisor on behalf of Flowcon, the general contractor for the construction and renovation project at 65 Irving, testified in his deposition that, at the time he got involved with the project, the McKelveys "wanted to live in the residence and have the first floor dedicated to some nonprofit organization that

---

[3] Varga disputes this statement, pointing to an application that Grand Merci later submitted to the New York City Department of Buildings, on November 11, 2022, in which it stated that the premises would be used for a not-for-profit community center.  Doc. 103 ¶ 58.  This application, and Grand Merci's representations therein, are discussed further below.  *See infra* n.17.

they intended to run." Doc. 101-6 at 38–39. Then, when asked whether, as of May 18, 2022, the McKelveys intended to use any portion of the space as a community center, he responded, "Yes. That would be the not-for-profit that I was referring to earlier." *Id.* at 39.[4]

Mr. McKelvey also testified that, at some point in time, he considered that the first floor of 65 Irving, which was an open space, might be useful for fundraising events. Doc. 101-3 at 48. Later in his deposition, when asked specifically how he and his wife intended to use the ground floor when they first purchased the building in 2020, Mr. McKelvey testified that they planned to have a "bedroom or office" there, and they additionally thought that they could use that floor to host parties. *Id.* at 197, 198. Counsel for Varga asked whether the idea to host parties was "in connection with the Alpha Epsilon fund," a charity run by the McKelveys. *Id.* at 198; *see also id.* at 49. Mr. McKelvey responded:

> It was for whatever reason we needed. We didn't have a specific entity in mind. It was just, do we need a space to have an event, either a private party or a fundraiser, it seemed like that would be a nice use of the space.

*Id.* at 198. In the lead-up to purchasing 65 Irving, the McKelveys also discussed the possibility of renovating the building to add another bedroom and bathroom, as well as to expand the basement. *Id.* at 21; Doc. 101-4 at 30.

Renovations began shortly after Grand Merci acquired 65 Irving. Doc. 101-3 at 25–26. On August 2, 2021, Grand Merci contracted Flowcon—a New Jersey corporation and general contracting business, AC ¶¶ 6, 13; Doc. 99 ¶ 12—to perform and oversee the construction and renovation work. Doc. 109-1 ¶ 7. Their contract, entitled "Agreement Between Owner and Construction Manager as Constructor," identified Grand Merci as "Owner," and Flowcon as "Construction Manager." Doc. 101-5 (the "Agreement") at 1; Doc. 109-1 ¶ 8; Doc. 99 ¶ 6.

---

[4] Day did not specify at his deposition how or when he learned of this purported intent.

Pursuant to Article 9 of the Agreement, Flowcon was to retain subcontractors for any work that it "does not customarily perform with [its] own personnel." Doc. 101-5 § 9.1. Article 11 of the Agreement provided that Flowcon was responsible for implementing safety precautions and complying with applicable safety laws. *Id.* § 11.2. Specifically, it provided that Flowcon:

- "shall be generally responsible for implementing safety precautions and programs in connection with the performance of the Work";

- "shall, either directly or by means of its subcontracts with its Subcontractor, provide for reasonable precautions for safety of, and shall provide reasonable protection to prevent damage, injury or loss to . . . employees on the Work and other persons who may be affected thereby";

- "shall . . . comply with applicable laws, ordinances, rules, regulations and lawful orders of public authorities bearing on safety of persons or property or their protection from damage, injury or loss"; and

- "shall erect and maintain, as required by existing conditions and laws, reasonable safeguards for safety and protection."

*Id.* While it stated that Flowcon was "generally responsible" for safety, however, it provided that "[s]ubcontractors are specifically responsible for the safety of their workforce and their entire operation at the Project Site." *Id.* With regards to insurance, the Agreement:

- required Flowcon to purchase and maintain commercial general liability insurance, *id.* §§ 12.1.1, 12.1.2;

- made Grand Merci responsible for purchasing and maintaining Owner's liability insurance with coverage and limits equal to that of the construction manager, § 12.2; and

- required Grand Merci to purchase and maintain property insurance, § 12.3.

*See also* Doc. 106 ¶ 9. Flowcon states that the Agreement did not contain any language requiring Flowcon or Grand Merci to name one another as an additional insured party in their respective liability policies. Doc. 99 ¶ 9.

On January 1, 2022, Flowcon subcontracted LSJ, Varga's employer, for carpentry work on the 65 Irving project. Doc. 109-1 ¶ 10; *see* Doc. 101-7 (the "Flowcon-LSJ Agreement") at ECF 1. According to the Flowcon-LSJ Agreement, LSJ was to "perform all work and . . . furnish all supervision, labor, materials, plant, hoisting, scaffolding, tools, equipment, supplies and all things necessary for the construction and completion of the work[.]" Doc. 101-7 § 2. The Flowcon-LSJ Agreement also provided indemnification and liability provisions, including the following:

> To the fullest extent permitted by law [LSJ] shall indemnify, defend, and hold harmless, [Flowcon], [Grand Merci] and their respective officers, directors, employees, and agents ("Indemnified Parties") from and against all claims, damages, demands, losses, expenses, fines, causes of action, suits or other liabilities (including all costs reasonable attorneys' fees, consequential damages, and punitive damages), arising out of or resulting from, or alleged to arise out of or arise from, the performance of [LSJ's] Work under the Subcontract, and any Work Order whether such claim, damage, demand, loss or expense, is attributable to bodily injury, personal injury, sickness, disease or death, or to injury to or destruction of tangible property . . .

Doc. 101-7 § 4(c). LSJ was also obligated to procure and maintain an insurance coverage policy that would "provide a defense and indemnify [Flowcon]" with respect to, inter alia, bodily injury caused by LSJ or those acting on its behalf. *Id.* § 5. The Flowcon-LSJ Agreement additionally required LSJ to name Flowcon and Grand Merci as "additional Insureds" on the commercial liability policy. *Id.* § 6. Finally, the Flowcon-LSJ Agreement provided a "Safety" clause, stating:

> [Flowcon] makes no representation with respect to the physical conditions or safety of any Project Site. [LSJ] shall, at its own expense, preserve and protect from injury its employees engaged in the performance of the Work . . . [LSJ] shall comply with all safety measures initiated by [Flowcon] and all federal, state, labor, and local laws, regulations and codes concerning safety as shall be applicable to the Work and to the safety standards established by [Flowcon] during the progress of the work . . . [LSJ] shall indemnify, defend, and hold harmless [Flowcon], [Grand Merci], and their respective . . . agents and employees from any costs, expenses or liability (including attorneys' fees, fines or penalties) arising out of [LSJ's] failure to comply with the aforesaid laws, regulations and codes.

*Id.* at ECF 3, 5.

James Day was Flowcon's on-site supervisor for the 65 Irving project.  Doc. 103 ¶ 30.  As on-site supervisor, Day was responsible for assigning work to each person at the job site, as well as to walking the job site at various points throughout the day to ensure that the work was being carried out in accordance with his instructions.  *Id.* ¶ 31. Specifically, Day was responsible for instructing and supervising Flowcon's subcontractors at the project, including LSJ, and inspecting their work.  *Id.* ¶ 33.  Day's duties also included ensuring jobsite safety at the project, and he had the authority to stop work at the project in the event he observed work being performed in an unsafe manner. *Id.* ¶¶ 32, 34.  Varga testified that he did what Day told him to do, and that he referred to Day as "the boss."  *Id.* ¶ 40.

Generally, Mr. McKelvey's points of contact at Flowcon included Day, Flowcon owner John Flower, and Flowcon project manager Ralph Totino.  Doc. 101-3 at 83; *see, e.g.*, Doc. 107-3 at 1.  Mr. McKelvey testified that, if he or his wife wanted to make any changes to the general concept of the project, they would tend to communicate that to the architect.  Doc. 101-3 at 193.  On occasions when the McKelveys visited 65 Irving, Day walked them through the site to show them the ongoing work and any work that had been completed.  Doc. 103 ¶ 35.  The McKelveys did not provide any instructions, equipment, or tools to the workers.  *Id.* ¶¶ 36, 37.  In fact, Mr. McKelvey testified that while he occasionally walked through the property, he "tended to visit in the evenings when there was nobody there," and was only there on roughly seven occasions while work was being performed.  Doc. 101-3 at 178–79, 182, 188.  When asked at his deposition if he had "the authority to stop unsafe work practices" had he witnessed any, Mr. McKelvey responded, "I don't think so"; then, when asked who *would* have that authority, Mr. McKelvey responded, "I assume the general contractor."  *Id.* at 178.  Similarly, when asked at his deposition what he would have done had he ever seen any work being performed in an

unsafe manner, Mr. McKelvey responded that he "probably would have asked a question as to whether or not it was safe," to "whoever Flowcon's representative was." *Id.* at 189.

### 2. The Sprinklers Installation Project

On February 22, 2022, Totino of Flowcon emailed the McKelveys to inform them that "additional sprinkler work" needed to be done at 65 Irving. Doc. 107-3 at 2. He wrote:

> After the engineer walked the site, it was determined that a total of (88) sprinkler heads were needed across all floors to satisfy code. The previously approved change order . . . captured the (14) heads at the upper floors – 3rd, 4th, 5th – . . . This current change order includes the additional (74) heads . . .

*Id.* On February 28, 2022, Ms. McKelvey responded, in part: "Could you please resend the sprinkler drawings for the 2nd, 1st, and basement floors? Is it the size of those floors or the commercial zoning (or both) that warrants so many sprinklers on those floors?" *Id.* at 1–2. Totino replied that day, in relevant part:

> You are correct, it is a combination of both commercial zoning and room size that is dictating the sprinkler quantities . . . Also, commercial zones require a sprinkler head in every room, regardless of its size. For example, you'll notice that the Cellar level has a head in each proposed room while the Powder Room on the 3rd floor does not require a head.

*Id.* at 1.

Day testified that LSJ had to bring additional employees onto the work site on May 9, 2022 for the sprinkler work, because they needed sheetrock removed so that the sprinkler plumbing company could do their work. Doc. 101-6 at 133–34. "LSJ was the carpentry subcontractor retained for work at the premises and was on site from the inception of the project daily." Doc. 106 ¶ 21. LSJ employed Varga to perform carpentry and sheetrock work at the premises, and Varga was at the premises on only two occasions. Doc. 109-1 ¶ 11. Day testified that he first saw Varga at the premises on May 9, 2022. Doc. 101-6 at 132. On that first day, Day instructed LSJ to remove sections of ceiling sheetrock on the first floor in connection with the sprinkler work. Doc. 106 ¶ 22. Varga objects to that testimony on grounds that what occurred on May 9, 2022 is

8

irrelevant as his claims pertain to May 18, 2022, the date of the subject incident. *Id.* In any event, Varga does not dispute that Flowcon realized that the sprinkler system needed to be upgraded to be brought "up to code" prior to May 18, 2022, the second date on which he was at the site. Doc. 109-1 ¶ 12; *see also* Doc. 101-2 at 67.

On both days Varga was at the site, Day showed Varga the sheetrock work that needed to be performed, including how to measure and where to measure, and what had to be cut out from the ceiling. Doc. 103 ¶ 39. Flowcon additionally states in its memorandum of law, and Varga does not dispute: "Bela Mezsibriscki from LSJ was the competent person on site, to ensure safety, and the [site supervisor] (Mr. Day) was not required to be on site eight hours daily. At the end of the workday, either Day or Mr. Mezsibriscki would lock up the premises." Doc. 100 at 8. LSJ brought tools to the job site, including an oscillating saw for cutting wood and sheetrock. Doc. 106 ¶ 19. Flowcon, meanwhile, provided items such as "Baker scaffolds," A-frame ladders, hardhats, and safety glasses. *Id.* ¶ 20.

### 3. The Incident

On May 18, 2022, Varga arrived at the job site before 8 a.m. *Id.* ¶ 29. Day instructed Varga and his brother Akos Varga ("Akos")—who also worked for LSJ—to remove certain sections of sheetrock from the second-floor bathroom ceiling, so that the plumbers could install sprinklers. Doc. 109-1 ¶ 13. Varga argues in his memorandum of law that this bathroom was in a part of 65 Irving that was zoned for commercial use. Doc. 102 at 4.[5] Day marked a section of the sheetrock for Varga to remove. Doc. 109-1 ¶ 14. The bathroom ceiling was 7 feet, 7 inches high. *Id.* ¶ 15; Doc. 106 ¶ 24. Day provided Varga with a 4-foot A-frame fiberglass ladder—which Day had previously

---

[5] Grand Merci acknowledges, but does not contest, this assertion. It states: "[Varga's] main argument can be summarized as follows – the section of the house where [Varga's] accident occurred was zoned as commercial property and, therefore, the homeowner's exemption to New York Labor Law does not apply. This is an incorrect statement of the law and [Varga] does not cite to a single case where the zoning of a property or portion thereof was determinative on the issue of the homeowner's exemption." Doc. 108 at 2.

inspected—to use to remove the section of sheetrock. Doc. 109-1 ¶¶ 16, 44; Doc. 106 ¶ 23. Grand Merci alleges that the ladder had rubber feet, based on a photograph of the subject bathroom taken after the incident, Doc. 90-8, as well as on Day's testimony that he assumed they would have used a ladder with rubber feet on the bathroom's marble floor. Doc. 103 ¶ 45; Doc. 101-6 at 151.

Prior to the accident, Varga did not make any complaints about the condition of the ladder and is not aware of anyone else who made complaints about its condition. Doc. 103 ¶ 53. Day performed a walk-through inspection of the site sometime between 8 a.m. and 10:30 a.m. Doc. 106 ¶ 24. The parties dispute, however, whether Flowcon gave Varga any additional instructions during that time. Flowcon states that Day went by the bathroom where Varga was working on two occasions prior to the accident, that Day "noted that [Varga] was having difficulty removing the sheetrock, because there was plaster on the ceiling," and that "Day told [Varga] to scrape off the plaster, find the sheetrock screws, and then remove it." *Id.* ¶ 25. Varga denies this in his counterstatement to Flowcon's Rule 56.1 statement, stating that Day only instructed him to remove the marked sections of the sheetrock from the ceiling with a sheetrock saw. *Id.*

Several details regarding the second-floor bathroom are also in dispute. First, the parties dispute what material the bathroom floor was covered with. Varga provides in his Rule 56.1 statement that the bathroom floor was covered with plastic. Doc. 91 ¶ 18. In his deposition, however, Varga had testified that there was a covering on the floor, but he did not remember what type of covering it was. Doc. 101-2 at 119. Later, in a sworn declaration submitted with his opposition to Grand Merci's cross-motion for summary judgment, Varga attested: "[T]he floor of the 2nd floor bathroom had a clear covering over it to protect the floor. This covering was smooth and slick. I believe it was made of

thin plastic." Doc. 104 ¶ 4.[6]  Varga's expert, Dr. James Pugh, Ph.D., P.E., who analyzed the legal documents, medical records, deposition testimony, photos of the ladder, and the defense's expert report, submitted an expert report on October 23, 2024, in which he opined that NYLL § 241(6) was violated, in part "because the subject ladder was placed on a *cloth covering* on the bathroom floor creating an unstable and slipping hazard[.]" Doc. 90-9 at 4 (emphasis added).  On April 11, 2025, however, Dr. Pugh submitted a supplement to that report, in which he stated that the phrase "cloth covering" from his October 23 report was best replaced with the words "protective covering," which he had also used to describe the covering in an earlier part of his October 23 report.  Doc. 107-6 at 1.  Day, in his deposition, testified that the bathroom floor had been covered with "some sort of protection material," however he was not asked—and did not offer—what type of material it was.  Doc. 101-6 at 152.  Grand Merci, in its counterstatement to Varga's Rule 56.1 statement, disputes that the floor covering was made of plastic, on the basis that neither Varga nor Day specified in their depositions which material the floor covering was made of.  Doc. 109-1 ¶ 18.

Second, while there is a dispute as to whether harnesses were available at the site, Docs. 109-1 ¶ 17, 95 ¶ 17, Varga states that it is "uncontroverted that . . . [he] was not provided with any other safety device—such as a harness and lifeline—in case he did fall." Doc. 89 at 8.  Grand Merci does not contest this assertion.  *See* Docs. 93 and 108.

---

[6] Grand Merci argues, as to Varga's declaration, that these "belated efforts to introduce new facts concerning the nature of the covering on the bathroom floor for the first time in opposition to Grand Merci's cross-motion for summary judgment . . . must be rejected" because they contradict Varga's earlier deposition testimony, and Varga's declaration does not identify the name of the Hungarian translator that he claims translated the declaration to him.  Doc. 108 at 7.  "[F]actual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial."  *Hayes v. New York City Dep't of Corrections*, 84 F.3d 614 (2d Cir. 1996) (citation omitted); *id.* (explaining that "if a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact" (citation omitted)).  Here, even though Varga did not describe the nature of the floor covering in his deposition, Varga's declaration is not the "sole" document that creates an issue of fact as to the material used to cover the floor or whether it was slippery, as further discussed below.

Varga placed the ladder Day had given to him on the floor, underneath the marked section of sheetrock, and he stepped up the ladder. Doc. 109-1 ¶ 19. Varga began to cut and remove the sheetrock using his hands and a saw, hammer, and crowbar provided by LSJ. *Id.* ¶¶ 19, 46; Doc. 103 ¶ 46.

At approximately 11:00 a.m., Doc. 106 ¶¶ 24, 31, Varga was attempting to remove a piece of sheetrock with his hands, by first pulling down on the left side of the sheetrock and then pulling on its right side, when he felt the ladder wobble to the left and right. Doc. 109-1 ¶ 22. Varga fell off the ladder and struck his face on "something extremely hard"—either a marble bathtub or the bathroom floor—breaking his nose. *Id.* ¶ 24. Varga states that he lost consciousness, and "when he came to, he was covered in blood." *Id.* Grand Merci disputes that Varga lost consciousness, based on statements Varga allegedly made to Emergency Medical Technicians ("EMTs"), as further discussed below. *Id.* Varga states that no one was holding or securing the ladder at the time of the fall, nor was the ladder secured by lanyards, ropes, or other means to prevent wobbling. *Id.* ¶ 23. Grand Merci also disputes that Varga fell because the ladder wobbled, stating that Varga told the EMTs shortly after the incident that he had "lost his balance and fell." *Id.* ¶ 22. The ladder did not itself fall over or break. *Id.* ¶ 51.

No one personally witnessed the accident. *Id.* ¶ 52. Varga testified that, while he was working, his brother Akos was outside of the bathroom, on the same floor, cleaning up debris from their work. Doc. 101-2 at 78. After Varga fell, Akos went to the third floor to get Day. Doc. 109-1 ¶ 25. When Day got to the second floor, he found Varga sitting on the bathroom floor covered in blood. *Id.* ¶ 26. Day cleaned him up, and with the assistance of one or more of Akos (according to Varga) and another LSJ worker named Bill (according to Grand Merci), Day helped Varga down the stairs to wait for an ambulance. *Id.* ¶ 27. Varga was transported by ambulance to the Emergency Room at Bellevue Hospital. *Id.* ¶ 28. A Prehospital Care Report Summary ("PCR") was generated, providing, among other information, details on the medical assessments,

medical attention, and transport to Bellevue Hospital the EMTs provided Varga.  Doc.
94-3.  In the narrative section, the PCR describes the EMTs' initial encounter with Varga,
providing in part:

> [Patient states] he was working on a ladder when he lost his balance and fell
> about 5ft to the ground.  Full assessment show clear deformation of
> [patient's] nose.  [Patient] rates the pain to his nose a 9 out of 10 on the
> numeric pain scale.  [*Patient denies*] – LOC, SOB, trauma to the head neck
> or back, abdominal pain, chest pain, nausea/vomiting/dizziness,
> numbness/tingling x4 extremities, alcohol/drug use, [patient] has no other
> complaints at this time.

*Id.* at 3.  Varga signed the PCR.  *Id.*  Grand Merci disputes that Varga lost consciousness,
stating that Varga in fact "denied loss of consciousness to [EMTs] shortly after the
alleged accident."[7]  Doc. 109-1 ¶ 24 (citing Doc. 94-3).  However, at his deposition,
Varga denied telling the EMTs that the accident occurred because he lost his balance, and
he stated he did not remember whether the EMTs asked him if he lost consciousness.
Doc. 101-2 at 123–24.  When asked whether he had any difficulties communicating with
the EMTs, Varga responded, "I didn't tell them much.  All I told them was that I was in a
lot of pain."  *Id.* at 123.  Varga testified that he did not have translation assistance while
speaking with the EMTs.  *Id.*

On May 19, 2022, Day prepared an incident report, based on his recollection,[8]
which he submitted to Totino.  Doc. 107-5; *see also* Doc. 101-6 at 187, 189.  On the last
page of the report, Day wrote "[his] conclusion regarding what happened," as follows:

> After reviewing the pictures of the accident, the ceiling height and the work
> that was completed, it is my opinion that the accident occurred while
> [Varga] was standing on the ladder.  He was most likely on one of the lower
> steps and pulled the sheetrock down hard on his nose.  He then got off the
> ladder, dropped the sheetrock and then fell between the tub and the wall.
> There was no blood on the tub deck, the sink or the toilet which indicates to
> me that the injury to his nose was not the result of hitting any hard surface.

---

[7] The Court infers that Grand Merci interprets "LOC" in the PCR to stand for "loss of consciousness."  Doc.
94-3 at 3.

[8] Day testified that, in preparing the report, he also may have looked at pictures, a call log, and screenshots
of texts.  Doc. 101-6 at 189.

Doc. 107-5 at 3. At his deposition, Day testified that, before writing his conclusion, he discussed the incident with Bill Mezsibriscki, of LSJ, who "wasn't there"; Day testified as follows:

> My conversation with Bill was I don't understand what happened. I said my thought process is that he was standing too close to the ceiling on the ladder. And *instead of scraping all the plaster off like I told him to* and taking out the screws, it would make it easier to just remove the Sheetrock, he just kept pulling on it and hit his nose . . . Bill said something to the effect of that sounds probable to me.

*Id.* 191–92 (emphasis added). Based on this testimony, Flowcon argues in its memorandum of law that Varga "ignored instructions to perform his work safely." Doc. 100 at 7.

### 4. Garage Addition and Department of Buildings Application

The McKelveys ultimately decided that they wished to add a garage to the first-floor level of 65 Irving. Doc. 106 ¶ 4; Doc. 103 ¶ 55. The parties dispute when this decision came about: Grand Merci alleges that the McKelveys decided that they wished to add the garage several months after Varga's fall; Varga disputes that assertion, stating that the testimony is unclear as to timing. Doc. 103 ¶ 55. At her deposition, when asked when she and Mr. McKelvey decided that they wanted to have a garage at the property, Ms. McKelvey testified that it was "much later" than at the time of purchase in 2020. Doc. 101-4 at 31. Then, when asked to approximate what time frame she was referring to, Ms. McKelvey responded that "it would have been at the end of summer of 2022 when [the McKelveys] drove [their] car from Missouri to New York." Doc. 101-4 at 31.

Grand Merci claims that, in order to obtain a permit from the New York City Department of Buildings (the "DOB") for the addition of a garage, a portion of the premises was required to be designated as a public space. Doc. 103 ¶ 56.[9] On November

---

[9] Varga denies this statement, on grounds that "The legal requirements regarding the process of obtaining a permit from the [DOB], calls for a legal conclusion, and as such, is not a material fact 'as to which the moving party contends there is no genuine issue to be tried.'" *Id.* (quoting Local Civil Rule 56.1).

11, 2022, approximately six months after Varga's fall, Grand Merci submitted an application to the DOB proposing that a garage be built on the property. Doc. 107-1 (the "DOB Application"); *see also* Doc. 107 ¶ 1. The application included the following statement:

> The basis of our request is as follows:
>
> 1) The subject building is a five (5) story mixed-use building with commercial uses on the 1st and 2nd floors and residential use on the 3rd, 4th and 5th floors in Community Board 5. There are two (2) dwelling units in the building.
>
> 2) The owner proposes to convert a portion of the 1st, 2nd and 3rd floor to not-for-profit food-related community facility.
>
> 3) The building owner proposes . . . to construct a one story, 94 SF extension on the roof of the 3rd floor setback for community facility use. . .
>
> > [ . . . ]
>
> 6) The one-car sized parking space, which is proposed on the first floor of the building, will be for the sole use of the community facility owner.

Doc. 107-1 at ECF 1, 2. However, Grand Merci submits that the representations to the DOB that a portion of the premises would be used for a not-for-profit community center were not true, but rather were made "with the sole intention of adding a garage to the premises," and "[n]either the McKelveys nor anyone else on behalf of Grand Merci ever intended to utilize any portion of the premises for any purpose other than their primary residence." Doc. 109-1 ¶¶ 57, 58. In emails exchanged between September and November of 2022, the McKelveys and Flowcon discussed that allocating some of the space as a "Community Facility" could help make the best case to the DOB for a garage space. *See* Doc. 94-4 at ECF 1–6. In a November 1, 2022 email, Ms. McKelvey wrote: "Community facility sounds great as we were probably going to use the space as the foundation office anyway." *Id.* at ECF 4. The next day, Totino wrote: "Can you share more information on the non-profit that you were planning to operate out of the 1st floor office? What type of work do you do? It might help our case with the DOB if we claim that a garage is necessary for the type of work being done." *Id.* at ECF 6. Ms. McKelvey

responded, in part: "We will have between 5-10 staffers in NYC within two years . . . The team who will work in at [sic] 65 Irving sets long-term strategy for the foundation, conducts research . . . and does the administrative work . . . ." *Id.* at ECF 5.[10]

Ms. McKelvey testified that she provided bank-related documentation regarding Alpha Epsilon to Flowcon, with the understanding that it would be used to get "[s]ome building permit. Probably related to the greenhouse, the garage, to avoid adding stairs." Doc. 101-4 at 91. She testified that she told Flowcon about Alpha Epsilon because "there was a conversation where they said we think zoning this as a public space . . . is the way to get this permit, do you guys have any charities." *Id.* at 92. Ms. McKelvey testified that she understood that the filing would assert Grand Merci's intent to locate Alpha Epsilon at the space, however she never had any intention to actually operate Alpha Epsilon at that space. *Id.* at 93. The testimony then proceeded as follows:

> Q. Okay. And so did you have an understanding at that point in time that Flowcon . . . would be filing some sort of permit application to the Department of Buildings that was contrary to what Grand Merci's actual intent was at the time?
>
> A. Yes.
>
> Q. And, therefore, would not be truthful; correct?
>
> A. Yes.
>
> Q. And it would not be accurate; correct?
>
> A. Yes.
>
> Q. And you were okay with that?
>
> A. Yes.

*Id.* at 93–94. On January 11, 2023, the DOB Application was approved with certain conditions, including that "The Certificate of Occupancy Comments Section shall state that the proposed use of the enclosed parking space shall be for

---

[10] More than a year later, on February 2, 2024, Totino emailed, in part: "The commissioner has approved our application for both the zoning changes and the garage port!" *Id.* at ECF 8. Ms. McKelvey responded, in part: "Another thing we need to find out before fully committing to this final phase is whether a philanthropic 'community facility' needs to be regularly inspected in any way past final construction inspections[.]" *Id.* at ECF 7.

the philanthropic and/or non-profit institution only." Doc. 107-1 at ECF 4. The McKelveys testified that—as of the date of their depositions—the garage was not yet built, however approximately a fifth of the first-floor space was allocated to it. Doc. 101-4 at 39; Doc. 101-3 at 76.

Varga states that, as of February 10, 2025, 65 Irving was still under construction. Doc. 103 at ¶ 29. He explains that, as of that date:

> [A]ffixed on a plywood construction wall on the exterior of the building was a banner with a diagram of the property stating: "Work in Progress: Mixed Use." Also affixed to the construction wall were several open permits, including a permit issued to defendant FlowCon, Inc. on October 21, 2024, covering work on the cellar, 1st, 2nd, and 3rd floors, to "add Community Facility in the Building and add Garage on 1st Floor."

*Id.*; *see also* Doc. 90-10 (photo of scaffolding and appended signage).

**B. Procedural History**

Varga filed his initial complaint on September 1, 2022, and an amended complaint on July 7, 2023. Docs. 1, 38. Varga alleges first, that he "was injured due to defendants' negligence, carelessness and recklessness," and second, that he was injured due to Defendants' violations of NYLL §§ 200, 240(1), and 241(6).[11] AC ¶¶ 55–64. Varga claims $6,000,000.00 in damages. *Id.* ¶¶ 57, 64, 65.

On January 24, 2023, Flowcon filed a third-party complaint against LSJ, alleging claims of contribution and indemnification, as well as contractual indemnification for Varga's alleged injuries or damages, and breach of contract for failure to procure insurance. *See generally* Doc. 17. On May 5, 2023, a clerk's certificate of default was entered as to LSJ, Doc. 31, and on May 25, 2023, the Court entered default judgment for Flowcon, against LSJ. Doc. 37.

---

[11] Varga additionally claims that Defendants violated Part 23 of the New York Industrial Code, Doc. 38 ¶ 63; however, Varga does not bring this claim as an independent basis for recovery, but rather as the basis for his claim that Defendants violated NYLL § 241(6), which, as discussed below, requires a showing that Defendants violated a New York standard of conduct. *See* Doc. 89 at 14.

On July 28, 2023, Flowcon answered the amended complaint and asserted cross-claims against Grand Merci, asserting, in part, that Grand Merci is required to "defend, indemnify, and hold FlowCon harmless for the full amount of any recovery or judgment herein, including an award of attorneys' fees, costs, and disbursements to FlowCon." Doc. 42 ¶ 39.

On August 28, 2023, Grand Merci answered the amended complaint, Doc. 53, and on August 29, 2023, it filed an amended answer and cross-claims against Flowcon, asserting in part that Grand Merci is "entitled to full indemnification from, and to judgment over and against co-defendant, [Flowcon], for all or part of any verdict or judgment which plaintiff may recover against [Grand Merci]." Doc. 54 ¶ 88.

Varga was deposed on April 11, 2024. Doc. 101-2. Day was deposed on April 17 and 19, 2024.[12] Doc. 101-6. Mr. and Ms. McKelvey were deposed on June 10 and September 5, 2024, respectively. Docs. 101-3, Doc. 101-4.

Following discovery, on February 14, 2025, Varga moved for partial summary judgment against Defendants, seeking summary judgment on the issue of liability under NYLL §§ 200, 240(1), and 241(6). Doc. 88. Varga also filed a corresponding Rule 56.1 statement, Doc. 91.

On March 14, 2025, Grand Merci filed its opposition and a cross-motion for summary judgment as to all of Varga's claims, as well as on Grand Merci's cross-claim for common law indemnification against Flowcon.[13] Doc. 92. Grand Merci also filed a Rule 56.1 statement and counterstatement to Varga's Rule 56.1 statement. Doc. 95. On April 18, 2025, Grand Merci filed a corrected statement and counterstatement. Doc. 109-1.

---

[12] Although only a deposition transcript from April 19, 2024 was filed on the record, that transcript references Day being deposed on April 17. *See* Doc. 101-6 at 17; *see also* Docs. 90-5, 98-6.

[13] In its briefs, Flowcon does not address Grand Merci's cross-claim for indemnification against it. *See* Docs. 100, 111.

Also on March 14, 2025, Flowcon filed its opposition and a cross-motion for summary judgment as to Varga's claims, as well as on Flowcon's claim for contractual indemnification from third-party defendant LSJ. Docs. 96, 100 at 1.[14] Flowcon additionally filed a Rule 56.1 statement, Doc. 99, however it did not file a counterstatement to Varga's Rule 56.1 statement.

On April 11, 2025, Varga filed briefs opposing each of Grand Merci's and Flowcon's cross-motions, and replying to their oppositions in support of its motion for partial summary judgment. Docs. 102 and 105, respectively. Varga also filed counterstatements to each of Grand Merci's and Flowcon's Rule 56.1 statements. Docs. 103 and 106, respectively. On April 18, 2025, Grand Merci filed a reply in support of its cross-motion for summary judgment. Doc. 108. Flowcon filed its reply on July 21, 2025. Doc. 111.

## II.    LEGAL STANDARD

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Senno v. Elmsford Union Free School District*, 812 F. Supp. 2d 454, 467 (S.D.N.Y. 2011) (citing *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)). A fact is "material" if it might affect the outcome of the litigation under the governing law. *Id.* The party moving for summary judgment is first responsible for demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, "the nonmoving party must come forward with admissible

---

[14] Flowcon states in its notice of motion that it seeks summary judgment against Varga and against Grand Merci. Doc. 96. However, in its memorandum of law, it states that it opposes Varga's motion for partial summary judgment and moves for summary judgment for contractual indemnification from LSJ. Doc. 100 at 1. Flowcon makes no argument in its memoranda of law as to why summary judgment in its favor is appropriate against Grand Merci. Docs. 100, 111.

evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Saenger v. Montefiore Medical Center*, 706 F. Supp. 2d 494, 504 (S.D.N.Y. 2010) (quoting *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008)).

In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Williams v. R.H. Donnelley, Corp.*, 368 F.3d 123, 126 (2d Cir. 2004)). However, in opposing a motion for summary judgment, the non-moving party may not rely on unsupported assertions, conjecture or speculation. *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996); *see also Ridinger v. Dow Jones & Co.*, 651 F.3d 309, 317 (2d Cir. 2011). To defeat a motion for summary judgment, "the non-moving party must set forth significant, probative evidence on which a reasonable fact-finder could decide in its favor." *Senno*, 812 F. Supp. 2d at 467–68 (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 256–57 (1986)).

The same legal standard applies when analyzing cross-motions for summary judgment. *See Schultz v. Stoner*, 308 F. Supp. 2d 289, 298 (S.D.N.Y. 2004) (quoting *Aviall, Inc. v. Ryder System, Inc.*, 913 F. Supp. 826, 828 (S.D.N.Y. 1996)). "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entertainment, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing *Schwabenbauer v. Board of Education*, 667 F.2d 305, 314 (2d Cir. 1981)). The Court is not required to grant summary judgment in favor of either moving party. *See id.* (citing *Heublein Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)).

## III.    DISCUSSION

### A. Homeowners' Exemption

As an initial matter, Grand Merci argues that it is exempt from liability under

NYLL §§ 240(1) and 241(6) based on the homeowners' exemption.  Section 240(1) of the

NYLL states:

> All contractors and owners and their agents, except owners of one and two-family dwellings who contract for but do not direct or control the work, in the erection, demolition, repairing, altering, painting, cleaning or pointing of a building or structure shall furnish or erect, or cause to be furnished or erected for the performance of such labor, scaffolding, hoists, stays, ladders, slings, hangers, blocks, pulleys, braces, irons, ropes, and other devices which shall be so constructed, placed and operated as to give proper protection to a person so employed.

NYLL § 240(1).  Section 241(6) of the NYLL states:

> All contractors and owners and their agents, except owners of one and two-family dwellings who contract for but do not direct or control the work, when constructing or demolishing buildings or doing any excavating in connection therewith, shall comply with the following requirements:  . . . All areas in which construction, excavation or demolition work is being performed shall be so constructed, shored, equipped, guarded, arranged, operated and conducted as to provide reasonable and adequate protection and safety to the persons employed therein or lawfully frequenting such places.

NYLL § 241(6).  Both § 240(1) and § 241(6) explicitly exempt from liability "owners of

one and two-family dwellings who contract for but do not direct or control the work."

NYLL § 240(1); NYLL § 241(6); *see Zapata v. Riverside Study Center, Inc.*, No. 10 Civ.

6283 (CM), 2012 WL 1744792, at *15 (S.D.N.Y. May 16, 2012).  The homeowners'

exemption was added to the two statutes in 1980, in order "to shield homeowners from

the harsh consequences of strict liability under the provisions of the Labor Law."  *Bartoo

v. Buell*, 87 N.Y.2d 362, 367, 662 N.E.2d 1068, 1070 (1996) (citing *Cannon v.

Putnam*, 563 N.Y.2d 16, 19, 564 N.E.2d 626, 629 (1990)).  These amendments reflected

"the legislative determination that the typical homeowner is no better situated than the

hired worker to furnish appropriate safety devices and to procure suitable insurance

protection."  *Id.*  In other words, "[t]he exception was enacted to protect those people

who, lacking business sophistication, would not know or anticipate the need to obtain insurance to cover them against the absolute liability imposed by section 240(1)." *Assevero v. Hamilton & Church Properties, LLC*, 953 N.Y.S.2d 548, 2012 WL 1622640, *5 (Sup. Ct. 2012) (citation omitted). The exemption "may properly be extended only so far as the language of the exception fairly warrants, and all doubts should be resolved in favor of the general provision rather than the exception." *Byrnes v. Yeats Construction Management Inc.*, No. 12 Civ. 5355 (LMS), 2018 WL 11431626, at *5 (S.D.N.Y. Nov. 19, 2018) ("*Byrnes II*") (quoting *Van Amerogen v. Donnini*, 577 N.E.2d 1035, 1036 (1991)). Defendants, those claiming the benefit of the exception, bear the burden to show that it applies. *Lombardi v. Stout*, 80 N.Y.2d 290, 297, 604 N.E.2d 117, 120–21 (1992).

The New York Court of Appeals has "avoided an overly rigid interpretation of the homeowner exemption and ha[s] employed a flexible 'site and purpose' test to determine whether the exemption applies." *Bartoo*, 662 N.E.2d at 1070. Specifically, "[i]n determining whether a building constitutes a family dwelling under [NYLL] § 240(1), 'the physical characteristics of the building and its suitability for one- or two-family habitation are by no means controlling. Rather, a court must look to the use to which the defendants have put the property.'" *Byrnes v. Yeats Construction Management Inc.*, No. 12 Civ. 5355 (NSR) (LMS), 2017 WL 4045484, at *5 (S.D.N.Y. Sept. 11, 2017) ("*Byrnes I*") (quoting *Sweeney v. Sanvidge*, 705 N.Y.S.2d 723, 734 (3d Dep't 2000)). For example, the homeowners' exemption does not apply "where a building, though structurally a one-family dwelling, was used by its owner exclusively for commercial purposes," because the exemption "is not designed to protect homeowners who use their one or two-family premises entirely and solely for commercial purposes and who hardly are lacking in sophistication or business acumen such that they would fail to recognize the necessity to insure against the strict liability imposed by the statute." *Byrnes II*, 2018 WL 11431626, at *5.

22

Where a structure is used for *both* residential and commercial purposes, the inquiry is based on the site and purpose of the work itself. *Cannon*, 564 N.E.2d at 629 (holding that "the existence of both residential and commercial uses on a property does not automatically disqualify a dwelling owner from invoking the exemption"). "The 'site and purpose' test is fact-intensive." *Zapata*, 2012 WL 1744792, at *17 (denying summary judgment where there was a genuine dispute as to whether a church's chapel, where the construction accident took place, was used for residential or commercial purposes, and noting that there was also hardly any evidence concerning the defendant's business acumen). "The common thread in these cases is whether the work performed primarily relates to or benefits the residential use of the premises or the commercial use of the premises." *Jin v. Tenrikyo Mission New York Center, Inc.*, No. 3778-11, 2013 WL 3227788, at *4 (N.Y. Sup. Ct. May 9, 2013). For example, "when an owner of a one- or two-family dwelling contracts for work that directly relates to the residential use of the home, even if the work also serves a commercial purpose, that owner is shielded by the homeowner exemption from the absolute liability of Labor Law §§ 240 and 241." *Bartoo*, 662 N.E.2d at 1070; *see, e.g.*, *id.* at 366, 369 (where the owner of a residence had a nearby barn where he stored his personal belongings and also leased space for others to store their golf carts for a fee, holding that, while the work repairing the barn's leaky roof "served the commercial purpose of protecting" the golf carts from weather damage, "any commercial benefit was ancillary to the substantial residential purpose served by fixing the leaking barn roof"); *cf. Paganini v. Congregation Eretz H'Chaim*, 950 N.Y.S.2d 724, 2012 WL 987618, at *4 (Sup. Ct. 2012) ("[T]he court finds that the repairing of the roof was being performed to benefit defendant's use of the premises as a summer vacation property, and is, therefore, more of a commercial than a residential usage."), *aff'd*, 962 N.Y.S.2d 683 (2013). The "site and purpose" test is based on "the homeowners' intentions at the time of the injury underlying the action and not their hopes for the future." *Lenda v. Breeze Concrete Corp.*, 903 N.Y.S.2d 417, 419 (2d Dep't 2010)

(citations omitted). Finally, "corporate ownership of a property, in and of itself, does not preclude application of the homeowner exception[.]" *Assevero*, 2012 WL 1622640, *7.

Grand Merci argues that it is protected by the homeowners' exemption because the McKelveys intended to use 65 Irving as a single-family dwelling and "there is no evidence that Grand Merci directed/controlled plaintiff's work at the site or provided any tools/equipment for purposes of the renovation work."[15] Doc. 93 at 3. The Court finds that there is a genuine dispute as to whether 65 Irving can be deemed a "dwelling" and whether Varga's work served a residential or commercial purpose.

The parties do not dispute that, at the time of the incident, 65 Irving was zoned for "mixed use"—commercial and residential—with the first (ground) floor and part of the second floor zoned for commercial use. Doc. 109-1 ¶¶ 5, 6. Also, Varga argues—and Grand Merci does not contest—that at the time of the incident, the second-floor bathroom in which he was injured was in a part of the building that was zoned for commercial use. Doc. 102 at 4.

Grand Merci argues, however, that the mixed-use zoning of the subject premises is not dispositive and should not preclude the McKelveys from availing themselves of the homeowners' exemption. Grand Merci is correct that Varga does not point to a case in which a building's zoning was itself determinative of whether the homeowners' exemption applied. However, a case that Grand Merci relies on, *Assevero v. Hamilton & Church Properties., LLC*, is instructive for analyzing zoning classifications. 953 N.Y.S.2d 548, 2012 WL 1622640 (Sup. Ct. 2012).

*Assevero* concerned a brownstone which, "[a]t the time of purchase, . . . consisted of a retail shop on the ground floor, apartments on the second, third, and fourth floors,

---

[15] While the homeowners' exemption applies to "owners of one and two-family dwellings who contract for but *do not direct or control the work*," § 240(1), § 241(6), the parties here focus on the first part of the assessment, whether the property is a "dwelling," in arguing whether the homeowners' exemption applies to Grand Merci. The parties analyze Grand Merci's role in directing or controlling the work in relation to the § 200(1) claim.

and an interior common staircase." *Assevero*, 2012 WL 1622640, *2. The owner defendants hired the plaintiff to supervise a gut renovation that would convert the brownstone from a "three-family multiple dwelling" into "two duplex apartments," specifically because "if it had remained a three-story apartment dwelling with a commercial ground floor space, [the defendant] would have been required by the [DOB] to install, among other things, a commercial elevator, a sprinkler system, and a fire escape." *Id.* at *2, *8. Indeed, after the renovation, the defendant did not have to make those installations because the DOB classified the premises as a "single or two-family residence with a 'store zoning.'" *Id.* at *8. The New York Supreme Court granted summary judgment for the defendant, finding that the homeowners' exemption applied; it reasoned, "although the rental of one of the apartments—as well as the ground floor— makes this case a close one, defendant has also demonstrated that the renovation of the building was predominantly related to its residential use, entitling defendant to the exemption." *Id.* The court went on to discuss how, after the renovation, the DOB classified the building as a one- or two-family dwelling with a store zoning, and it stated: "Thus, while the building contained a ground floor commercial space, it was structurally—or stated otherwise, principally—a two-family dwelling because it contained two residential duplex apartments." *Id.*

Here, unlike in *Assevero*, the purpose of the construction work at issue was not to *avoid* installations required by a commercial zoning designation, but rather to bring the building into compliance with them. Doc. 102 at 5. Specifically, Varga was removing sheetrock to prepare for the installation of a sprinkler head in a commercially zoned area of 65 Irving. As Ms. McKelvey confirmed in a February 2022 email exchange with Flowcon, this work was part of a sprinkler head installation project that was needed at least in part because of the building's commercial zoning. *See* Doc. 107-3; Doc. 109-1 ¶ 12. Therefore, there is no genuine dispute of material fact that Varga was injured in a commercially zoned area of the building and doing work geared towards compliance with

25

the commercial zoning. *Cf. Zapata*, 2012 WL 1744792, at *16 ("[I]f [defendant] uses only *part* of the Building as a residence and other parts for non-residential purposes, the exemption would only apply to accidents resulting from work done in the residential portions of the facility."); *Assevero*, 2012 WL 1622640, at *11 (holding that the exemption applied, noting, "[i]n addition, as defendant correctly notes, the accident took place while plaintiff was [in] . . . areas which were renovated into the duplex apartments."). Moreover, while Grand Merci states that there was *never* any intention to use 65 Irving for anything other than as the McKelveys' primary residence, this appears to be at odds with Mr. McKelvey's testimony that he contemplated using the ground floor for fundraisers, and Day's testimony that, as of May 18, 2022, the McKelveys wanted to dedicate the first floor to a not-for-profit. Therefore, a reasonable jury could find that, at the time of the incident, Grand Merci intended to use 65 Irving for both residential and commercial purposes, and that the "site and purpose" of Varga's work was commercial.

On the other hand, a reasonable jury could find, based on the McKelveys' testimony, that the renovation work at 65 Irving primarily served a residential purpose because they intended for the building to become their home.[16] *Cf. Lombardi*, 604 N.E.2d at 121 (stating that the homeowners' exemption is not applicable if the "purpose in making renovations" is "to prepare the house for commercial rental"). Again, Grand Merci argues that "there was never any intent to utilize any portion of the townhouse for any non-residential use." Doc. 93 at 4. Even though Mr. McKelvey testified that he thought the ground floor may be suitable for public events such as fundraisers, the record could support a finding that this non-residential use of the space was only contemplated as an incidental use of a primarily residential space. *See Cannon*, 564 N.E.2d at 651 (finding the homeowners' exemption applied where the landscaping work was meant to

---

[16] In fact, Grand Merci argues the instant case is analogous to *Assevero* which, as discussed, held that the defendant was entitled to the homeowners' exemption, having "demonstrated that the renovation of the building was predominantly related to its residential use." *Assevero*, 2012 WL 1622640, *8.

beautify the front yard of defendant's home, "notwithstanding that the work may have fortuitously affected another area of the property that was used for commercial activities"). And in any event, it is not uncommon for "public" events such as fundraisers to be held in private homes.

The homeowners' exemption has been found to apply even where the construction at issue provides *some*—an "incidental"—commercial benefit to the premises. *See, e.g.*, *Johnson v. Fox*, 701 N.Y.S.2d 506, 508 (2000) ("In this two-story structure, the business of defendants only occupies four rooms and a bath on the first floor. The remaining rooms and bath on the first floor, and all of the second floor, are limited strictly to residential purposes. Consequently, the improvement being performed by plaintiff [on the roof] at the time of his injury primarily benefits the residential purpose of the premises and provides only an incidental benefit to the commercial business located exclusively on the first floor of the dwelling.").

Here, while Varga was working in a commercially zoned portion of the building, it is clear from Flowcon's February 28, 2022 email to Ms. McKelvey—which discusses the sprinkler installation plans—that the renovation work was active throughout the building, not just in commercially zoned areas. Therefore, assessing the sprinkler installation project as a whole, and taking as true the McKelveys' testimony that they intended to use 65 Irving as a residence, a reasonable jury could find that, while Varga's work served to bring the building into compliance with commercial zoning requirements, that benefit was merely incidental to the McKelveys' primary goal of readying the building for residential use.[17] *See, e.g.*, *Yerdon v. Lyon*, 686 N.Y.S.2d 223, 225 (3d Dep't

---

[17] However, as discussed above, on November 11, 2022, a mere six months after Varga's accident, Grand Merci submitted an application to the DOB proposing that a garage be built on the property, and stating that the building was a "mixed-use building with commercial uses on the 1st and 2nd floors," and that "[t]he owner propose[d] to convert a portion of the 1st, 2nd and 3rd floor to a not-for-profit food-related community facility." Doc. 107-1 at ECF 1–2. Although Ms. McKelvey testified that those assertions were not truthful because the McKelveys never had any intention to actually operate a not-for-profit in the space, Doc. 101-4 at 93–94—the representations to the DOB at the very least call into question Grand Merci's

1999) (where "the renovations being done on defendants' house . . . enhanced both the intended residential use by defendants and their intended commercial use," finding that the homeowners' exemption applied because, "[w]hile the record does not reveal the percentage of residential use versus commercial use, it is clear that the major part of the renovated house was going to be used by defendants as a residence and by a second-floor tenant," and "[t]he renovations, while creating two small spaces for bed and breakfast guests, were major and related to the entire building.").

Finally, there is a genuine dispute of material fact as to whether Grand Merci is the kind of unsophisticated homeowner that the exemption is meant to protect. On one hand, a reasonably jury could conclude that Grand Merci is not a "typical homeowner"— the kind that is shielded from liability because he "is no better situated than the hired worker to furnish appropriate safety devices and to procure suitable insurance protection." *Bartoo*, 662 N.E.2d at 1070. The McKelveys testified that they own nine or ten homes, three of which are in New York, and Mr. McKelvey testified that he has "substantial real estate investments" in 30 to 50 properties, worth hundreds of millions of dollars, as well as an ownership of partnership interest in more than 50 companies. Doc. 101-3 at 12, 63. "Given their substantial real estate and business portfolio," Varga argues, "the members of [Grand Merci] are clearly not the unsophisticated homeowners lacking in business acumen to appreciate the stringent responsibilities imposed by Labor Law §§

---

genuine intent. Grand Merci argues that the plan to add a garage, and the DOB application, are irrelevant because they arose *after* the incident, whereas the "site and purpose" assessment for determining whether homeowners' exemption applies "must be employed on the basis of the homeowners' intentions *at the time of the injury*." Doc. 93 at 4 (emphasis in original) (citing *Solis v. 340 West 12 Realty LLC*, 208 N.Y.S.3d 584, 586 (1st Dep't 2024)). Nonetheless, courts have taken into account defendants' actions taking place *after* a plaintiff's injury in assessing what their intentions were at the time of the injury. *See, e.g.*, *Lombardi*, 604 N.E.2d at 121 (emphasis added) (finding a genuine issue of fact as to defendant's intended use of the property, where the premises had previously been a one-family residence but defendant "stated that the purpose in renovating [it] included upgrading it for possible future rental *and he did, in fact, subsequently rent the house to two families*."). *But see Allen v. Fiori*, 716 N.Y.S.2d 414, 415 (3d Dep't 2000) (finding the homeowners' exemption applied, despite plaintiff's presentation of "some evidence of defendants' inchoate plan to convert the structure to a commercial use," because at the time of injury, the evidence established that "the purpose of the work plaintiff was engaged in . . . was merely to coordinate the color of the carriage house to the main house, an overall home improvement measure.").

240(1) and 241(6). Indeed, they were sophisticated enough to form an LLC to purchase the subject property, rather than purchasing it in their own names." Doc. 102 at 10.

On the other hand, the cases which Varga cites to are not on all fours with this case because each—which found that the homeowners' exemption did not apply—concerned defendants whose commercial real estate sophistication was greater than Grand Merci's on its face. *See Rossi v. Flying Horse Farm, Inc.*, 2013 N.Y. Slip Op. 34033, 2013 WL 11261256, at *5 (N.Y. Sup. Ct. Oct. 3, 2013) (finding the homeowners' exemption did not apply to the defendant who, "at the time of the accident, was acting in his capacity as an officer of a corporation that owned commercial property"), *aff'd*, 16 N.Y.S.3d 316 (2d Dep't 2015); *see also Banegas v. Farrell Building Co., Inc.*, 2014 N.Y. Slip Op. 31858, 2014 WL 3615885, at *7 (N.Y. Sup. Ct. July 15, 2014) (finding the homeowners' exemption did not apply to the defendant, a construction company, because "[t]o extend the exemption to a construction company and its owners, 'who hardly are lacking in sophistication or business acumen such that they would fail to recognize the necessity to insure against the strict liability imposed by the statute' would run contrary to the legislative intent of the exemption" (quoting *Van Amerogen*, 577 N.E.2d at 1036)). Here, there is nothing in the record to suggest that Mr. McKelvey was actively engaged in the operation of his properties, or whether he was simply a passive investor of real estate.

In sum, there is a genuine dispute of material fact "with respect to [Grand Merci's] intended use of the property and whether the work was part of the plan to accomplish that use," *Lombardi*, 604 N.E.2d at 121, as well as with respect to its level of sophistication for purposes of the homeowners' exemption. Therefore, the Court denies summary judgment on the §§ 240(1) and 241(6) claims against Grand Merci.

### B. NYLL 240(1)

Section 240 of the NYLL, commonly referred to as the scaffold law, is intended to guard against the lack of adequate protection to workers from certain elevation-related hazards. *Byrnes I*, 2017 WL 4045484, at *4 (citing *Ross v. Curtis-Palmer Hydro-Electric*

*Co.*, 81 N.Y.2d 494, 500, 618 N.E.2d 82, 85 (1993)). To establish liability under the statute, a plaintiff must show: (1) the existence of an elevation-related hazard of the type encompassed by the statute, and (2) an injury proximately caused by the absence of proper protection from the hazard. *Byrnes I*, 2017 WL 4045484, at *4 (citing *Wilinski v. 334 E. 92nd Housing Development Fund Corp.*, 18 N.Y.3d 1, 7, 959 N.E.2d 488, 491 (2011)).

In enacting § 240(1), the legislative intent was to protect workers "by placing 'ultimate responsibility for safety practices at building construction jobs where such responsibility actually belongs, on the owner and general contractor' instead of on workers who 'are scarcely in a position to protect themselves from accident.'" *Morales v. Spring Scaffolding, Inc.*, 802 N.Y.S.2d 41 (1st Dep't 2005) (citations omitted). The statute thus imposes liability that is strict, or absolute, in two senses: "the duty it imposes is nondelegable, and thus contractors and owners are liable under the statute whether or not they supervise or control the work; and where an accident is caused by a violation of the statute, the plaintiff's own negligence does not furnish a defense." *Cahill v. Triborough Bridge & Tunnel Authority*, 790 N.Y.S.2d 74, 76, 823 N.E.2d 439, 441 (2004). It is still necessary, however for the plaintiff to show that the defendant's violation of the statute was the proximate cause of his injury. *Id.*

Section 240(1) requires contractors and owners to protect workers against "such specific gravity-related accidents as falling from a height or being struck by a falling object that was improperly hoisted or inadequately secured." *Ross*, 618 N.E.2d at 85. "Labor Law § 240(1) requires that safety devices, such as ladders, be so 'constructed, placed and operated as to give proper[ ]protection' to a worker." *Klein v. City of New York*, 89 N.Y.2d 833, 834–835, 675 N.E.2d 458, 459 (1996). "[T]the furnished device itself must be *adequate* to protect against the hazards entailed in the performance of the particular task to which the employee was assigned." *Conway v. New York State Teachers' Retirement System*, 530 N.Y.S.2d 300, 303 (3d Dep't 1988) (emphasis in

original) (citation omitted). The "failure to properly secure a ladder to insure that it remains steady and erect while being used, constitutes a violation of Labor Law § 240(1)." *Plywacz v. 85 Broad Street LLC*, 72 N.Y.S.3d 80, 81 (1st Dep't 2018) (quoting *Schultze v. 585 West 214th Street Owners Corp.*, 644 N.Y.S.2d 722, 722 (1st Dep't 1996)). "[T]he issue of whether a particular safety device provided proper protection is generally a question of fact for the jury." *Alava v. City of New York*, 668 N.Y.S.2d 624, 625 (2d Dep't 1998) (citation omitted). "[T]he single decisive question is whether [the] plaintiff's injuries were the direct consequence of a failure to provide adequate protection against a risk arising from a physically significant elevation differential." *Runner v. New York Stock Exchange, Inc.*, 895 N.Y.S.2d 279, 280–81, 922 N.E.2d 865, 866–67 (2009).

Varga argues that § 240(1) was violated because "the A-frame ladder [he] was using was clearly inadequate to shield him from the elevation-related risk he faced as he performed the heavy sheetrock removal work," and because Varga "was not provided with any other safety device—such as a harness and lifeline—in case he did fall." Doc. 89 at 8. The Court finds that there is no genuine dispute of material fact that the unsecured ladder did not provide Varga with proper protection, and that this inadequate protection proximately caused his injury.

First, the Court finds that Varga makes out a *prima facie* case of a § 240(1) violation. Varga testified in his deposition that he was attempting to remove a piece of sheetrock with his hands, pulling it from its left side and then its right side, when he felt the ladder wobble to the left and right, causing him to fall. Doc. 101-2 at 82, 85, 119. *See Moldovan v. Prestige Construction NYC, LLC*, No. 20 Civ. 4699 (EK) (VMS), 2025 WL 964002, at *4 (E.D.N.Y. Mar. 31, 2025) ("[Plaintiff's] testimony that the ladder shifted for no apparent reason is sufficient to establish a *prima facie* case of a statutory violation. His testimony is also sufficient, if credited by a jury, for a finding that this shifting was the proximate cause of his fall." ); *see also Gonzalez v. 1225 Ogden Deli Grocery Corp.*, 71 N.Y.S.3d 473, 474 (1st Dep't 2018) ("Plaintiff made a prima facie

showing of a violation of section 240(1) by his unrebutted testimony that he fell from an unsecured ladder.").

Both Grand Merci and Flowcon argue that Varga's testimony is called into question by his statement—allegedly made to the EMTs—that he fell because he lost his balance. Flowcon also argues that the "only evidence of a ladder defect" is Varga's unreliable testimony, and thus, because Varga "was the sole witness to the incident . . . and reported that he lost his balance in the immediate aftermath, summary judgment should be denied to plaintiff as issues of fact exist with regard to causation." Doc. 100 at 2. However, Varga does not claim the ladder was defective, but rather claims it was "not secured properly from movement." Doc. 105 at 3. Moreover, as further discussed below, it is not inherently contradictory to state that a loss of balance, versus a wobbly ladder, caused Varga's fall. In addition, "[t]he fact that the plaintiff may have been the sole witness to [an] accident does not preclude an award of summary judgment in his favor." *Melchor v. Singh*, 935 N.Y.S.2d 106, 110 (2d Dep't 2011). Flowcon would have to offer "evidence, other than mere speculation, to undermine the plaintiff's showing of entitlement to judgment as a matter of law, or present a bona fide issue regarding the plaintiff's credibility as to a material fact." *Id.* Because there is no inherent contradiction between Varga's statements, the Court does not find grounds to question his credibility in stating that he fell because the ladder wobbled.

Given Varga meets his *prima facie* burden of establishing that the unsecured ladder did not remain stable, and that its wobbling caused his fall, "the burden shifts to defendants to present evidence that the ladder was adequately secured . . . or that [Varga's] conduct was 'the sole proximate cause of his injuries.'" *Moldovan*, 2025 WL 964002, at *5 (citation omitted). Defendants argue that the ladder was not itself defective, that it had been previously used without issue, and that Varga told EMTs directly following the incident that he had "lost his balance and fell." Doc. 100 at 2. The first two contentions are not material, because as discussed, a ladder may be defective *or*

unsecured for purposes of § 240(1) liability. *See Moldovan*, 2025 WL 964002, at *5 (stating that Defendants' argument, including that "the ladder was itself an adequate device because [plaintiff] did not identify a defect with the ladder" would not "give rise to a dispute of *material* fact" as a ladder need not be defective for § 240(1) liability (emphasis in original)); *see also id.* at *4 ("[A]n unsecured ladder, even one in good condition, can give rise to [§] 240(1) liability if the worker falls from it." (quoting *Noor v. City of New York*, 15 N.Y.S.2d 13, 16 (1st Dep't 2015)); *Cutaia v. Board of Managers Of the 160/170 Varick Street Condominium*, 172 A.D.3d 424, 425 (1st Dep't 2019) (failure to ensure that a ladder will "remain steady and erect is precisely the foreseeable elevation-related risk against which section 240 (1) was designed to protect."), *rev'd on other grounds*, 169 N.Y.S.3d 902 (2022).

   As for Defendants' argument that Varga initially told the EMTs that he lost his balance, and that he signed the PCR saying so, the Court finds that Varga's statement to that effect would not contradict his later statement that the ladder wobbled.[18] Faced with similar arguments, multiple courts have held that it is not inconsistent to say that one lost his balance and that his ladder moved, as the latter is an elaboration of the former. *See, e.g.*, *Lin v. 100 Wall Street Property L.L.C.*, 148 N.Y.S.3d 71, 73 (1st Dep't 2021) ("Plaintiff's statement to his supervisor that he fell because he lost his balance is consistent with his more detailed testimony regarding how he lost his balance and fell from the ladder after it moved." (citation omitted)); *Hill v. City of New York*, 35 N.Y.S.3d 307, 310 (1st Dep't 2016) (finding no inconsistency between plaintiff's account that he

---

[18] Varga additionally argues that his "*alleged* statement" to the EMTs that he "lost his balance and fell" is inadmissible hearsay because it is not pertinent to his diagnosis or treatment. Doc. 102 at 14 (emphasis in original). The Court disagrees; such statement would arguably be admissible in trial pursuant to Federal Rule of Evidence 803(4)(A) because "statements concerning the physical events precipitating a patient's slip and fall have been considered reasonably pertinent to a medical diagnosis insofar as *how* a person fell is at least somewhat suggestive of whether an underlying medical condition caused the fall." *Congemi v. Wal-Mart Stores E., LP*, No. 19 Civ. 8220 (NSR), 2021 WL 4066653, at *8 (S.D.N.Y. Sept. 7, 2021) (emphasis in original). In any event, the Court finds that a statement that Varga lost his balance would not contradict his testimony that the ladder wobbled.

lost his balance and fell versus his testimony that he fell after the ladder wobbled, and stating that it is "of no moment" that "that he did not mention the ladder wobbling" in the affidavit in which he stated he lost his balance).

Flowcon additionally argues that Varga himself created a "lateral external force" that caused the ladder to wobble, by pulling on the sheetrock from left to right. Doc. 100 at 7. Even accepting this argument as true, it would not compel a finding that the ladder was properly secured for the task. *See Moldovan*, 2025 WL 964002, at *4 ("New York courts read the statute to require ladders to be secured either by independent mechanical means, or by having a co-worker hold and secure it."). Nor does Flowcon's argument that Varga "ignored instructions to perform his work safely," Doc. 100 at 7—which is based only on Day's speculation that Varga did not remove the sheetrock the way Day allegedly "told him to," Doc. 101-6 at 191–92—compel a finding that Varga's actions were the *sole* proximate cause of his injuries. In *Plywacz*, the New York Appellate Division, First Department, found that the New York Supreme Court had properly granted plaintiffs' motion for partial summary judgment on the issue of § 240(1) liability, where a plaintiff "was injured when he fell from an unsecured ladder while installing steel wall panels in the lobby of a building." 72 N.Y.S.3d at 81. The First Department explained:

> It is irrelevant whether plaintiff initially lost his balance before or after the ladder wobbled because it is uncontested that the precipitating cause of both was that the suction cup that he had affixed to the panel and gripped to pull the panel into place came loose. Under either scenario, the ladder failed to remain steady under plaintiff's weight as he performed his work. Furthermore, even if plaintiff gripped the suction cup incorrectly, causing it to come loose, any such misuse of the suction cup was not the sole proximate cause of the accident where the unsecured ladder moved.

*Id.*

Here too, to the extent Varga's loss of balance was tied to his handling of the heavy sheetrock, Defendants have not established that his actions were so reckless or unforeseen as to render them the sole proximate cause of his injuries. *Beharry v. Public*

*Storage, Inc.*, 828 N.Y.S.2d 458, 459 (2d Dep't 2007) (where plaintiff was going up a set of unfinished stairs and fell "straight through" to the floor below after stepping on a "metal decking"—an "intermediate platform" that the court said "served as a functional equivalent of a ladder at the time of the accident"—holding that, "[c]ontrary to the defendants' contention, the injured plaintiff's conduct was not the sole proximate cause of his injuries, because he neither engaged in unforeseeable, reckless activities nor misused a safety device that was provided to him."); *see also Montalvo v. J. Petrocelli Construction, Inc.*, 780 N.Y.S.2d 558, 559, 561 (1st Dep't 2004) (where the plaintiff lost his grasp of a metal casing, causing the metal to fall and hit plaintiff and his ladder, which in turn caused the ladder to shake and throw plaintiff forward, finding the plaintiff's actions did not supersede defendant's failure to secure the A-frame ladder as a proximate cause of his injury); *Dasilva v. A.J. Contracting Co.*, 694 N.Y.S.2d 353, 354 (1st Dep't 1999) (addressing similar facts as in *Montalvo*, holding that "the absence of adequate safety devices was a substantial and, given the nature of the work being performed, [a] foreseeable cause of the plaintiff's fall and injury"); *cf. Gaspar v. Pace University*, 957 N.Y.S.2d 393, 395 (1st Dep't 2012) (finding a plaintiff who was working on asbestos removal fell "because he lost his balance," not due to a defective or inadequate A-ladder, where his face mask "became hooked on a cable hanging from the ceiling," and so "[i]n an effort to dislodge the mask from the cable, the injured plaintiff shook his head back and forth, during which time he lost his balance and fell from the ladder"). *But see Chin-Sue v. City of New York*, 8976-2007 (N.Y. Sup. Ct. Aug. 5, 2009)[19] (granting summary judgment to defendants on § 240(1) claim, finding that the plaintiff's fall from an A-frame ladder due to his "lost balance" was "tantamount to a slipping 'without more' scenario," where plaintiff had pulled on a cable that was stuck, such that when the cable advanced

---

[19] A copy of this order is filed as Doc. 107-4 in the instant case.

with his pull, he released it and lost his balance and fell, feeling the ladder shift to the right as he fell), *aff'd*, 919 N.Y.S.2d 870 (2d Dep't 2011).

In sum, the Court finds no genuine dispute of material fact that § 240(1) was violated because the ladder, standing without external reinforcements, "did not provide [Varga] with proper protection" for the sheetrock removal. *Melchor*, 935 N.Y.S.2d at 109. Accordingly, Varga is granted summary judgment as to the § 240(1) claim against Flowcon. As to Grand Merci, however, because there is a genuine dispute of material fact as to whether it is entitled to the homeowners' exemption, the Court does not reach the issue of whether it would be liable for violating § 240(1). Therefore, Varga is denied summary judgment as to its § 240(1) claim against Grand Merci. *See Chorzepa v. Brzyska*, 39 N.Y.S.3d 518, 520 (2d Dep't 2016) ("The plaintiff's cross motion for summary judgment on the issue of liability on the causes of action alleging violations of Labor Law §§ 240(1) and 241(6) should have been denied on the merits inasmuch as there are triable issues of fact as to the applicability of the homeowner's exemption.").

### C. NYLL 241(6)

Section 241(6) of the NYLL imposes a non-delegable duty of reasonable care upon owners and general contractors "to provide reasonable and adequate protection and safety for workers and to comply with the specific safety rules and regulations promulgated by the Commissioner of the Department of Labor." *Misicki v. Caradonna*, 882 N.Y.S.2d 375, 378, 909 N.E.2d 1213, 1216 (2009) (citation omitted). The Commissioner's safety rules are set out in the Industrial Code, Title 12 of the New York Codes, Rules and Regulations. *Id.* In order to prevail on a claim under § 241(6), the particular provision relied upon by a plaintiff must mandate compliance with "concrete specifications and not simply declare general safety standards or reiterate common-law principles." *Id.* (citations omitted). Whereas a violation of § 240(1) gives rise to both vicarious and absolute liability, a § 241(6) claim results in vicarious, but not absolute liability, and, thus, "[c]ontributory and comparative negligence are valid defenses to a

Section 241(6) claim." *Id.* Thus, "breach of a duty imposed by a rule in the Code is merely *some evidence* for the factfinder to consider on the question of a defendant's negligence." *Id.* (emphasis added).

Here, Varga contends that it is undisputed that Defendants violated Industrial Code § 23-1.21(b)(4)(ii) which provides: "All ladder footings shall be firm. Slippery surfaces and insecure objects such as bricks and boxes shall not be used as ladder footings." Varga argues that the footings of his A-frame ladder were not firm because there was a plastic covering beneath them, and that the slippery condition of the floor—in addition to the ladder being unsecured—was a substantial cause of his injuries. Doc. 89 at 15 and 15 n.4. Grand Merci contests that the covering was made of plastic or was otherwise slippery, and it argues that the ladder had rubber on all four feet. Flowcon, meanwhile, emphasizes that the ladder was found to be in good working condition, that it would not have moved absent an external force, and that Day testified that he believed Varga ignored his instructions on how to remove the sheetrock.

The Court finds that genuine issues of material fact exist as to whether the floor on which Varga worked was slippery, and if so, whether its slippery nature contributed to his injury. Varga states in his 56.1 statement that there was a covering on the floor, and that it was made of plastic, Doc. 91 ¶ 18, and he attests in his April 9, 2025 declaration that "the floor of the 2nd floor bathroom had a clear covering over it" which was "smooth and slick" and "made of thin plastic," Doc. 104 ¶ 4; however at his deposition, Varga had testified that he did not remember what type of covering was on the floor. Doc. 101-2 at 119. Varga's expert, meanwhile, initially referenced a "cloth covering" that created "an unstable and slipping hazard" in his October 23, 2024 report, Doc. 90-9 at 4, yet in an April 11, 2025 supplement to that report, he stated that the phrase "cloth covering" was best replaced with the words "protective covering." Doc. 107-6 at 1. Day also testified that the bathroom floor where Varga worked had been covered with "some sort of protection material," however he did not specify (and he was not asked) what type of

material it was.  Doc. 101-6 at 152.  Grand Merci argues that there is no evidence that the surface on which the ladder was placed was slippery; it points to the fact that Varga only testified to there being a covering, not to what material it was made of or whether it was slippery, argues that Varga's declaration should be rejected, and argues that Varga's expert's testimony that the covering was made of cloth is "clearly belied" by the photograph of the bathroom, Doc. 90-8.  Doc. 93 at 6, 7.  Therefore, Grand Merci argues, there is no evidence that the material "was slippery, much less that the material was made of cloth."  *Id.* at 7.  Grand Merci does not provide what material the covering *was* made of or otherwise provide evidence that that it was not slippery.  However, based on the contradicting accounts of what the covering was made of, and the very limited—contested—evidence that it was slippery, the Court finds there is a genuine dispute as to whether the ladder was on a slippery surface.

As for Grand Merci's contention that the ladder had rubber feet, while rubber feet could theoretically mitigate slippery conditions, Grand Merci does not provide evidence that the ladder was entirely immune from any slippery condition that may have been beneath it.  The same logic applies to Flowcon's argument that the ladder was in good working condition, and that Varga allegedly handled the sheetrock improperly:  neither factor, if true, would necessarily preclude a finding that Defendants violated Industrial Code § 23-1.21(b)(4)(ii).  Therefore, the Court also cannot find that no reasonable jury could return a verdict for Varga as to whether a slippery surface may have substantially contributed to his fall.

The Court thus denies summary judgment as to the § 241(6) claim.

### D.  NYLL Section 200

Section 200 of the NYLL states:

All places to which this chapter applies shall be so constructed, equipped, arranged, operated and conducted as to provide reasonable and adequate protection to the lives, health and safety of all persons employed therein or lawfully frequenting such places.  All machinery, equipment, and devices in

> such places shall be so placed, operated, guarded, and lighted as to provide
> reasonable and adequate protection to all such persons.

NYLL § 200(1). Section 200 is a codification of the common-law duty of an owner or general contractor to ensure that construction sites are safe places to work. *Buono v. AvalonBay Communities, Inc.*, No. 19 Civ. 5413 (LGS), 2021 WL 51524, at *4 (S.D.N.Y. Jan. 6, 2021); *see also DeMaria v. RBNB 20 Owner, LLC*, 12 N.Y.S.3d 79, 82 (1st Dep't 2015) (describing Labor Law § 200 as "a codification of common-law negligence"). Courts generally analyze § 200 claims and common law negligence simultaneously. *Buono*, 2021 WL 51524, at *4. A plaintiff "must demonstrate the existence of a duty, the breach of which may be considered the proximate cause of the damages suffered by the injured party." *Dos Santos v. A. Corradi Builders, Inc.*, No. 5 Civ. 3341 (KMK) (LMS), 2008 WL 11517447, at *3 (S.D.N.Y. Sept. 26, 2008) (citation omitted). "If one of these essential elements is absent . . . , as a matter of law, then the rest of the plaintiff['s] case is immaterial, and summary judgment for the defendant[] is appropriate." *Carley v. Theater Development Fund*, 22 F. Supp. 2d 224, 227 (S.D.N.Y. 1998).

"An implicit precondition to this duty to provide a safe place to work is that the party charged with that responsibility have the authority to control the activity bringing about the injury to enable it to avoid or correct an unsafe condition." *Dooley v. Peerless Importers, Inc.*, 837 N.Y.S.2d 720, 724 (2d Dep't 2007); *see also Corrales-Patino v. Procida Construction Corp.*, No. 19 Civ. 5579 (ER), 2021 WL 5331528, at *8 (S.D.N.Y. Nov. 15, 2021). However, "where a plaintiff's claims are 'based not on [his] employer's methods or materials but on a dangerous condition on the [work] site,' the question is not whether the defendant 'exercised supervisory control over the manner of performance of the injury-producing work,' but rather whether it 'had notice of the condition.'" *Wallace v. National Railroad Passenger Corp.*, 5 F. Supp. 3d 452, 466 (S.D.N.Y. 2014) (citation omitted).

Therefore, under § 200, courts have distinguished between "manner" cases and "premises" cases. *Sheerin v. Tutor Perini Corp.*, No. 18 Civ. 7952 (ALC) (SLC), 2022 WL 992917, at *9 (S.D.N.Y. Mar. 31, 2022) (citing *Wallace*, 5 F. Supp. 3d at 466–67). In "manner" cases, where the § 200 claim "arises out of alleged defects or dangers arising from a *subcontractor's methods* or materials," there must be sufficient evidence that the owner or general contractor "exercised some supervisory control over *the operation*," that is, "over the means or methods employed by [the subcontractor] to accomplish a task." *Id.* (emphasis in original) (citations omitted); *see also Kiss v. Clinton Green North, LLC*, No. 17 Civ. 10029 (LGS), 2020 WL 4226564, at *5 (S.D.N.Y. July 23, 2020) ("A defendant has the authority to supervise or control the work for purposes of [§] 200 when the defendant bears the responsibility for the manner in which the work is performed." (citation omitted)).

On the other hand, in "premises cases," where the § 200 claim "arises from a defective condition on the premises, 'notice of a dangerous condition is sufficient.'" *Sheerin*, 2022 WL 992917, at *9 (quoting *Wallace*, 5 F. Supp. 3d at 467 (citing cases)). "Notice refers to the creation of, or actual or constructive notice of, the defective or dangerous condition on the premises." *Id.* (quoting *Wynne v. B. Anthony Construction Corp.*, 862 N.Y.S.2d 379, 382 (2d Dep't 2008)).

Here, Varga does not explicitly argue whether this is a "manner" or "premises" case. On one hand, he invokes the standards of a "manner" case, by arguing that "each defendant possessed the requisite 'authority to control the activity bringing about the injury', i.e., plaintiff's work, and therefore could have taken remedial measures to prevent it from occurring." Doc. 89 at 18. On the other hand, Varga states the "premises" standard of liability—that "liability attaches if the owner or general contractor created the condition (or had actual or constructive notice of it)," Doc. 89 at 19—in the context of its argument that by covering the bathroom floor with plastic, Flowcon "*created* a slippery condition that substantially contributed to Peter Varga's fall." *Id.* (emphasis in original).

### 1. Grand Merci

As to Grand Merci, Varga argues that Grand Merci had the authority to supervise and control his work, because as the property owner that initiated the renovation project, "it clearly had authority over the entire project, including Peter Varga's work." Doc. 89 at 20. Grand Merci, meanwhile, argues that it had no involvement in supervising Varga's work, and it did not provide Varga with equipment to use at the site nor did it "otherwise have notice of any defective condition with respect to the subject ladder." Doc. 93 at 8.

Based on the record, the Court determines that no reasonable jury could find that Grand Merci "[bore] the responsibility for the manner in which the work [was] performed," as required for "manner" cases. *Kiss*, 2020 WL 4226564, at *5 (citation omitted). At his deposition, Mr. McKelvey testified that, as owners, the McKelveys defined the general scope of the work, and they would communicate with the architect if they wanted to make any changes to the general concept. Doc. 101-3 at 192–93. However, Mr. McKelvey testified that neither he, not anyone on Grand Merci's behalf, ever supervised the work of any of the subcontractors. *Id.* at 193–94. Mr. McKelvey testified that he occasionally walked through the property to see the progress of the work, Doc. 101-3 at 178–79; however, these walk-throughs rarely occurred while work was being performed, *id.* at 188, and Mr. McKelvey was guided through the property by Day. Doc. 103 ¶ 35. Further, when asked if he had "the authority to stop unsafe work practices" had he witnessed any, Mr. McKelvey responded, "I don't think so"; then, when asked who would have that authority, Mr. McKelvey responded, "I assume the general contractor." Doc. 101-3 at 178. Relatedly, when asked what he would have done had he ever seen any work being performed in an unsafe manner, Mr. McKelvey responded that he "probably would have asked a question as to whether or not it was safe," to "whoever Flowcon's representative was." *Id.* at 189. Varga, meanwhile, does not point to any evidence showing that Grand Merci ever supervised, directed, or controlled any aspect of the work that he performed.

Therefore, while Grand Merci had authority over the project as a whole, the evidence demonstrates that it only exercised this authority at a high level. At best, Grand Merci exercised "mere general supervisory authority at a work site for the purpose of overseeing the progress of the work and inspecting the work product," which "is insufficient to impose liability under Labor Law § 200." *Boody v. El Sol Contracting & Construction Corp.*, 116 N.Y.S.3d 586, 587 (2d Dep't 2020) (citation omitted); *see also Buono*, 2021 WL 51524, at *5 ("Here, Defendant cannot be liable for this claim based on a theory that the injury arose out of the manner in which the work was performed, because the evidence adduced reflects Defendant's general oversight only.").

Even if this were considered a "premises" case—which Varga does not appear to argue as to Grand Merci—Varga has offered no evidence to suggest that Grand Merci was on actual or constructive notice of his allegedly unsafe workspace. Accordingly, Grand Merci's motion for summary judgment on Varga's § 200 claim is granted.

### 2. *Flowcon*

As for Flowcon, Varga argues that it violated § 200 both by actively directing and controlling his work in an unsafe environment, and by creating the unsafe environment. Specifically, Varga argues that, on the day of the incident, Day directed him to remove the heavy sheetrock from the second floor bathroom, marked exactly which sections of sheetrock he was to remove from the ceiling, gave him the unsecured A-frame ladder, suggested which tool to use, "created a slippery condition" by covering the bathroom floor with plastic, and directed Varga to place the ladder upon the slippery floor covering in the bathroom. Doc. 89 at 19. In response, Flowcon argues, first, that it is not liable under § 200 because it "subcontracted all the physical work to the subcontractors, including LSJ," and Day, the only Flowcon employee who was regularly at the building, was not required to be on site eight hours daily. Doc. 100 at 8. Second, it argues that there is no evidence that it "created a hazardous on-site condition or had actual or constructive notice of one[.]" *Id.* Flowcon reiterates its argument that what caused the

accident was "the manner in which [Varga] did the work, ignoring the instructions provided by the site supervisor[.]"  *Id.*

Viewing the case as a "manner" case, there is no genuine dispute in the record that Flowcon, through Day, "actually supervised and controlled plaintiff's work," notwithstanding that LSJ, the carpentry subcontractor, was also present at the site.  *Juarez v. Noll Street Associates, LP*, 2008 N.Y. Slip Op. 31220, 2008 WL 1943595, at *5 (N.Y. Sup. Ct. Apr. 25, 2008).  It is undisputed that, "[a]s site supervisor, Day was responsible for . . . safety at the site," Doc. 99 ¶ 18, that he admittedly directed Varga's work, and that he was aware of both the ladder that Varga was using and the covering on the bathroom floor.  In fact, Day testified that on the day of the incident, he visited the bathroom in which Varga worked on two occasions prior to the accident, and he gave Varga feedback on how to remove the sheetrock after observing that he was having difficulties.[20]  Based on the record, no reasonable jury could find that Flowcon did not have "the authority to control the injury-causing activity to enable it to avoid or correct unsafe conditions."  *Corrales-Patino*, 2021 WL 5331528, at *8.

Viewing the case as a "premises" case, the Court finds that there is a genuine dispute as to whether Flowcon "had actual or constructive notice of a dangerous condition"—an unsecured ladder on a slippery floor.  *Juarez*, 2008 WL 1943595 at *4; Doc. 105 at 17.  Although there is no genuine dispute that Flowcon had notice that there was a floor covering, as discussed, there is a genuine dispute of material fact as to what the covering was made of and whether it was slippery.  Therefore, there is a genuine issue of material fact as to whether Flowcon had notice of a slippery floor.  *See Buono*, 2021 WL 51524, at *5 ("To constitute constructive notice, a defect must be visible and

---

[20] Varga denies this in his counterstatement to Flowcon's Rule 56.1 statement, noting that in his deposition, he only testified that Day gave him instructions for the sheetrock removal when Varga first arrived at the site that morning before 8 a.m.  Doc. 106 ¶ 25; Doc., 101-2 at 66–71.

apparent and it must exist for a sufficient length of time prior to the accident to permit defendant's employees to discover and remedy it.").

In sum, the Court grants summary judgment for Varga on the § 200 claim against Flowcon, on the basis that Flowcon had the authority to control the work that allegedly caused the accident.

### E. Indemnification

#### 1. Grand Merci's Claim for Common Law Indemnification

Grand Merci argues that it is entitled to common law indemnification from Flowcon for the § 240(1) claim, because Flowcon—and not Grand Merci—actually directed and controlled Varga's work. "While owners and general contractors owe nondelegable duties under the Labor Law to plaintiffs who are employed at their worksites, these defendants can recover in indemnity, either contractual or common-law, from those considered responsible for the accident." *Lewis v. Lendlease (US) Construction LMB Inc.*, 18 Civ. 8662 (LJL), 2022 WL 1304801, at *5 (S.D.N.Y. May 2, 2022) (quoting *Shea v. Bloomberg, L.P.*, 2 N.Y.S.3d 512, 515 (2d Dep't 2015)). "[A] party seeking contractual indemnification must prove itself free from negligence, because to the extent its negligence contributed to the accident, it cannot be indemnified therefor." *Shea*, 2 N.Y.S.3d at 515 (quoting *Cava Construction Co., Inc. v. Gealtec Remodeling Corp.*, 871 N.Y.S.2d 654, 662 (2d Dep't 2009)).

Flowcon does not respond to Grand Merci's motion for summary judgment on its cross-claim for common law indemnification against it. Therefore, the Court deems Grand Merci's motion unopposed by Flowcon. However, the Court reserves judgment on Grand Merci's claim for common law indemnification until a liability determination has been made as to all claims. *Empire Merchants, LLC v. Merinoff*, No. 16 Civ. 9590 (JMF), 2018 WL 317848, at *3 (S.D.N.Y. Jan. 5, 2018) ("It is black letter law that "indemnification claims do not typically ripen until *after* the merits of an action have been decided, and all appeals have been resolved.'" (emphasis in original) (quoting

*Hampshire Group, Ltd. v. Kuttner*, C.A. No. 3607 (VCS), 2010 WL 2739995, at *53 (Del. Ch. July 12, 2010)). Therefore, the Court denies Grand Merci's motion for summary judgment with respect to its indemnification claim against Flowcon.

### 2. *Flowcon's Claim for Contractual Indemnification*

Flowcon argues that it is entitled to contractual indemnification from third-party defendant LSJ—against whom default judgment was entered on May 25, 2023—pursuant to the subcontract agreement entered between them. However, as Flowcon provides: "To obtain conditional relief on a claim for contractual indemnification, 'the one seeking indemnity need only establish that it was free from any negligence and may be held liable solely by virtue of . . . statutory or vicarious liability.'" *Jamindar v. Uniondale Union Free School District*, 934 N.Y.S.2d 437, 442 (2d Dep't 2011) (alterations adopted)).

The Court has granted summary judgment for Varga on his § 200 claim against Flowcon. Section 200 is "a codification of common-law negligence," and "[c]ourts generally analyze claims brought under both § 200 and the common law simultaneously." *DeMaria*, 12 N.Y.S.3d at 82; *Buono*, 2021 WL 51524, at *4 (citations omitted). Therefore, based on the Court's finding that Flowcon is liable under § 200, it cannot be said that Flowcon is "free from negligence." *See Juarez*, 2008 WL 1943595, at *5 ("Since plaintiff's testimony indicates that . . . the general contractor . . . actually supervised and controlled plaintiff's work, [the general contractor] is thus subject to liability under Labor Law § 200 and common-law negligence."). Moreover, as discussed, the parties' indemnification claims will be resolved after all merit determinations have been made.

Therefore, the Court denies Flowcon's motion for summary judgment as to the contractual indemnification claim against LSJ.

## IV.    CONCLUSION

For the reasons set forth above, Varga's motion is GRANTED in part and DENIED in part, Flowcon's motion is DENIED, and Grand Merci's motion is

GRANTED in part and DENIED in part.

  The parties are directed to appear for a conference on October 21, 2025, at 11:30 a.m., in Courtroom 619 of the United States Courthouse, 40 Foley Square, New York, NY 10007.

  The Clerk of Court is respectfully directed to terminate the motions, Docs. 88, 92, and 96.

It is SO ORDERED.

Dated: September 29, 2025
   New York, New York

           _____
            EDGARDO RAMOS, U.S.D.J.